UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ORANDA LUERAS,

    Plaintiff,

v.                                                                                                                   Civ. No. 19-1069 GJF

ANDREW SAUL, *Commissioner of*
*the Social Security Administration*,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Plaintiff's "Motion to Reverse and Remand for a Rehearing with Supporting Memorandum" [ECF 15] ("Motion"). The Motion is fully briefed. ECF 19 (Response); ECF 20 (Reply). Having meticulously reviewed the entire record and the parties' briefing, and for the reasons articulated below, the Court will **AFFIRM** the Commissioner's final decision, **DENY** Plaintiff's Motion, and **DISMISS** this case **WITH PREJUDICE**.

**I.    BACKGROUND**

Plaintiff, Oranda Lueras, was born in 1974. Administrative Record ("AR") at 239. On March 7, 2013, Plaintiff protectively applied for Supplemental Security Income ("SSI"). *Id.* at 66. After a hearing on the matter, an administrative law judge ("ALJ") determined that Plaintiff was not disabled. *Id.* at 74. On December 1, 2016, Plaintiff once again protectively applied for SSI, alleging that she was disabled due to a lengthy list of ailments including, but not limited to, lumbar and thoracic degenerative disc disease, anxiety, chronic pelvic pain, migraines, uterus adenomyosis, temporomandibular joint disorder, depression, sleep apnea, and fibromyalgia. *Id.* at 200, 250–53. The Social Security Administration ("SSA") denied Plaintiff's claim initially and on reconsideration. *Id.* at 94, 112. After Plaintiff requested review, another ALJ held a hearing in August 2018. *Id.* at 38. The ALJ's analysis proceeded through step five of the sequential evaluation

process at which the ALJ determined that Plaintiff could perform jobs that "exist[ed] in significant numbers in the national economy" and thus concluded that Plaintiff was not disabled. *Id.* at 29. In September 2019, the Appeals Council denied Plaintiff's request for review. *Id.* at 5. Thereafter, Plaintiff timely appealed the ALJ's decision to this Court. ECF 1.

## II.   PLAINTIFF'S CLAIMS

Plaintiff challenges the ALJ's decision on three bases. First, Plaintiff contends that the ALJ improperly discounted the opinions of consultative examiner, Paula Hughson, M.D. ECF 15 at 1. Second, Plaintiff argues that the ALJ failed to account for each of the moderate limitations found by State agency psychiatrist, Scott Walker, M.D. *Id.* Third, Plaintiff claims that the ALJ did not perform a "mental function-by-function assessment," which she contends is required by Social Security Ruling ("SSR") 96-8P. *Id.*

## III.   APPLICABLE LAW

### A.   Standard of Review

The Court's review of an ALJ's decision is both legal and factual. *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence." (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992))).

In determining whether the correct legal standards were applied, the Court reviews "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)). The Court may reverse and remand if

the ALJ failed to "apply correct legal standards" or "show . . . [she] has done so." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (emphasis added). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (brackets in original) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "And . . . the threshold for such evidentiary sufficiency is not high.  Substantial evidence, [the Supreme] Court has said, is more than a mere scintilla." *Id.* (internal quotation marks and citation omitted).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). In other words, "[a] finding of 'no substantial evidence will be found only whether there is a conspicuous absence of credible choices or no contrary medical evidence.'" *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)) (internal quotation marks omitted).

Under this standard, a court should still meticulously review the entire record, but it may not "reweigh the evidence nor substitute [its] judgment for that of the agency." *Newbold v. Colvin*, 718 F.3d 1257, 1262 (10th Cir. 2013) (quoting *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004)); *Hamlin*, 365 F.3d at 1214. Indeed, a court is to "review only the sufficiency of the evidence, not its weight." *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). Therefore, "[t]he possibility of drawing two inconsistent conclusions from the evidence

does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). Furthermore, a court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* (quoting *Zoltanski*, 372 F.3d at 1200) (brackets omitted).

Ultimately, if the correct legal standards were applied and substantial evidence supports the ALJ's findings, the Commissioner's decision stands, and Plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin*, 365 F.3d at 1214.

### B. Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish that he or she is unable to "engage in *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added).

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (citing 20 C.F.R. § 416.920). The claimant bears the burden of proof at steps one through four. *See Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Williams v. Bowen*, 844 F.2d 748, 750-51, 751 n.2 (10th Cir. 1988). In the first four steps, the claimant must show (1) that "[s]he is not presently engaged in substantial gainful activity," (2) that "[s]he has a medically severe impairment or combination of impairments," and either (3) that the impairment is equivalent to a

listed impairment[1] or (4) that "the impairment or combination of impairments prevents [her] from performing [her] past work." *Williams*, 844 F.2d at 750-51; *Grogan*, 399 F.3d at 1261.

If the claimant has advanced through step four, the burden of proof then shifts to the Commissioner to show that the claimant nonetheless retains sufficient functional capacity "to perform other work in the national economy in view of [her] age, education, and work experience." *Yuckert*, 482 U.S. at 142, 146 n.5.

## IV. THE ALJ'S DECISION AND FINDINGS

"After careful consideration of the entire record," the ALJ decided that Plaintiff was not "under a disability . . . since December 1, 2016, the date the application was filed." AR 17, 30 (citing 20 C.F.R. § 416.920(g)).

### A. Steps One Through Three

At step one, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since" her alleged disability onset date. *Id.* at 17 (citing 20 C.F.R. § 416.971 *et seq.*). At step two, the ALJ concluded that Plaintiff had the following severe mental impairments: post-traumatic stress disorder; personality disorder with dependent traits; depression; anxiety; and obsessive-compulsive disorder. *Id.* (citing 20 C.F.R. § 416.920(c)). A step three, the ALJ determined that none of Plaintiff's impairments, alone or in combination, satisfied the criteria of a listed impairment. *Id.* at 18. (citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926).

---

[1] If the claimant can show that she has a listed impairment, she will be found to be disabled and the analysis stops. 20 C.F.R. § 416.920(a)(4)(i-iv). Otherwise, if no listed impairment can be shown, the analysis moves on to step four. *Id*.

### B. Step Four[2]

The ALJ found that Plaintiff had the following Residual Functional Capacity ("RFC"):[3]

> [Plaintiff can] perform less than a full range of light work . . . . She must be able to alternate between sitting and standing approximately hourly. She cannot kneel, crouch, or crawl. She can occasionally reach overhead with the left arm. She can frequently handle and finger with the left hand. She has no restriction with the right hand. She is limited to simple work-related decisions with few workplace changes. She can have occasional and superficial interactions with the public. She cannot work at a production rate pace or be required to perform tandem tasks.

AR at 20.[4] In making this finding, the ALJ considered: (1) Plaintiff's statements related to the limiting effects of her symptoms; (2) the objective medical evidence; (3) the medical opinions in the record; (4) the opinion of Licensed Clinical Social Worker ("LSCW") Janice Bailey;[5] and (5) the statements made by those familiar with the limiting effects of Plaintiff's conditions but who were not medical sources. *Id.* at 26–28. Plaintiff claimed to have difficulty remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. *Id.* at 21 (citing *id.* at 225). The ALJ found that although Plaintiff's "medically determinable impairments might be expected to cause some of [her] alleged symptoms," Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects" of her symptoms were "not entirely

---

[2] The Tenth Circuit has described step four of the sequential evaluation process as occurring in three distinct phases. *Winfrey*, 92 F.3d at 1023. In phase one, the ALJ evaluates a claimant's physical and mental residual functional capacity ("RFC"). *Id.* In phase two, the ALJ assesses the physical and mental demands of the claimant's past relevant work. *Id.* Last, the ALJ applies the phase one findings to the phase two findings to determine whether, given the claimant's RFC, she could meet the physical and/or mental demands of her past relevant work. *Id.*

[3] The RFC describes the most a claimant can do despite her limitations or restrictions. SSR 96-8P, 1996 WL 374184, at *1.

[4] The Court's summary of the evidence will be limited to that which relates to Plaintiff's mental limitations because her physical limitations are not at issue. *See* ECF 21.

[5] LCSW Bailey's opinion is not formally considered a "medical opinion," but rather an "[o]pinion[] from [a] medical source[] who [is] not [an] acceptable medical source[]." 20 C.F.R. § 416.927(f)(1).

consistent with the medical . . . and other evidence in the record." *Id.*

In reaching her conclusion, the ALJ considered Plaintiff's statements regarding her activities of daily living. For entertainment, Plaintiff watched television, listened to music, read, made jewelry, and socialized with family members. *Id.* at 23–24 (citing *id.* at 224, 226). Plaintiff shopped for groceries, made simple food, paid bills, counted change, and groomed herself. *Id.* (citing *id.* at 222–24); *see also id.* at 23 ("[Plaintiff] reported that she was able to perform her activities of daily living without assistance" (citing *id.* at 476)). Notably, Plaintiff also helped care for her two children. *Id.* (citing *id.* at 222).

In reviewing the objective medical evidence, the ALJ considered the findings that Plaintiff was alert and oriented, had limited insight, could perform certain concentration exercises, had average intelligence, and did not suffer from hallucinations of any sort. *Id.* at 23–24 (citing *id.* at 474–75, 477, 549, 575, 904, 909).

The ALJ considered the opinions of state agency doctors Scott Walker, M.D., and Alvin Smith, Ph.D., and gave them great weight because she found them consistent with the record. *Id.* at 25. Doctor Walker opined that Plaintiff had the ability to understand, remember and carry out simple instructions, attend and concentrate sufficient to complete a routine workday without significant interruptions from psychologically-based symptoms, exercise reasonable judgment, and interact appropriately with coworkers, supervisors, and the general public on a "superficial basis." AR at 87. Doctor Smith affirmed Dr. Walker's opinion. *Id.* at 103.

Paula Hughson, M.D., examined Plaintiff once in 2017 at the request of the state agency for 65 minutes, *id.* at 474–79; and again in July 2018 at the request of Plaintiff's attorney for 120 minutes, *id.* at 912. At both examinations, Plaintiff reported that she was the victim of childhood

7

sexual abuse. *Id.* at 474–76, 904–06. After the 2017 examination, Dr. Hughson assessed Plaintiff with two marked limitations and six moderate limitations. *Id.* at 26, 479. Dr. Hughson later revised those limitations in 2018, opining that Plaintiff now had four marked limitations, three moderate to marked limitations, and three moderate limitations. *Id.* at 26, 912. In her 2018 opinion, Dr. Hughson noted that Plaintiff brought to the examination "a two-and-a-half-page handwritten list of her physical and emotional symptoms/conditions" and remarked that the "document . . . might [have] seem[ed] shocking to the casual observer." *Id.* at 910. Dr. Hughson explained that although "twenty or even ten years ago [she] would have had no hesitation in diagnosing somatization disorder,[6] [she] . . . believe[d] that [Plaintiff] [wa]s exhibiting the full clinical picture of someone whose physical system ha[d] been biologically impacted by the effects of trauma." *Id.* at 910. To support her finding, Dr. Hughson cited several studies reinforcing the proposition that psychological trauma can cause or at least contribute to "the development of serious medical illness." *Id.* at 911–12. The ALJ assigned little weight to Dr. Hughson's opinions because she found them inconsistent with one another, the record, and internally. *Id.* at 26.

The ALJ also considered the opinion of LCSW Bailey, and "gave it little weight" because it was inconsistent with the record and because Ms. Bailey was not an "acceptable medical source." *Id.* LCSW Bailey opined that Plaintiff had several "moderate to marked limitations" caused by "excessive anxiety." *Id.* (citing *id.* at 900–01). The ALJ, however, found "little documented indications of such anxiety." *Id.* Similarly, the ALJ gave "little weight" to the statements of Javier

---

[6] Somatic symptom disorder is "characterized by an extreme focus on physical symptoms—such as pain or fatigue—that causes major emotional distress and problems functioning. [A person] may or may not have another diagnosed medical condition associated with [those] symptoms, but [their] reaction to the symptoms is not normal." Somatic Symptom Disorder, Mayo Clinic (May 8, 2018), https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776.

8

Pacheco (the father of Plaintiff's children), Melissa Lueras (Plaintiff's mother), and Savanna Pacheco (Plaintiff's daughter), because none of them were acceptable medical sources and because their statements were inconsistent with the record. *See id.* at 27–28; *see generally id.* at 265–71.

Because Plaintiff did not have any past relevant work experience, the ALJ proceeded to step five of the sequential evaluation process. *Id.* at 28 (citing 20 C.F.R. § 416.965 (describing how the SSA considers past-work experience)).

### C. Step Five

The ALJ determined that "[c]onsidering [Plaintiff's] age, education and work experience, and residual functional capacity, there we[re] jobs that exist[ed] in significant numbers in the national economy that" Plaintiff could perform. *Id.* at 29 (citing 20 C.F.R §§ 416.969, (a)). Based on Plaintiff's RFC, the vocational expert testified that Plaintiff could perform the requirements of representative occupations like "price tagger" and "photocopy machine operator." *Id.* The ALJ thus concluded that Plaintiff was not "under a disability, as defined in the Social Security Act, since December 1, 2016, the date the application was filed." *Id.* at 30 (20 C.F.R. § 416.920(g)).

## V.   DISCUSSION

### A. The ALJ Did Not Err in Weighing the Opinions of Dr. Hughson

Plaintiff argues that the ALJ did not provide sufficient valid reasons for giving Dr. Hughson's opinions little weight. ECF 15 at 11. Specifically, Plaintiff contends that Dr. Hughson's opinions were consistent with the record, with one another, and internally. *Id.* at 11–15.

In determining whether a claimant is disabled, the SSA "will always consider the medical opinions" in the claimant's record "together with the rest of the relevant evidence" it reviews. 20 C.F.R. § 404.1527(b). Accordingly, the SSA evaluates "every medical opinion" it receives.

9

§ 404.1527(c). The SSA considers the following factors in weighing medical opinions: (1) whether the source examined the claimant; (2) whether the source treated the claimant;[7] (3) the extent to which the opinion is supported by objective medical or other evidence; (4) whether the medical opinion is consistent with the record as a whole; (5) whether the source is a specialist on the impairment in question; and (6) any other factor that the claimant brings to the SSA's attention. §§ 404.1527(c)(1)-(6). Upon weighing the medical opinions in the record, the ALJ "must discuss the weight he assigns to such opinions." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). In doing so, the ALJ is not required to discuss each factor articulated in the regulations; rather, the ALJ must merely explain her weighing decision with sufficient specificity so as to be capable of review. *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). Put differently, if an ALJ rejects an opinion,[8] "'[she] must then give specific, legitimate reasons for doing so.'" *Id.* (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). The Court finds that the ALJ provided sufficiently specific and legitimate reasons for giving little weight to Dr. Hughson's opinions.

The limitations found by Dr. Hughson were, as the ALJ observed, inconsistent with the record. For example, in 2018, Dr. Hughson opined that Plaintiff had a marked limitation in interacting with the public and marked to moderate limitations in her abilities to interact with coworkers and supervisors. AR at 912. But, as the ALJ noted, Claimant was "usually described as pleasant and cooperative, having normal speech, making appropriate eye contact, [and] fairly well

---

[7] Also included in this factor are considerations for how long the source has treated the claimant and the knowledge the source has of the claimant's alleged impairments. *See* 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii).

[8] The Tenth Circuit has said that a conferral of "little" weight is effectively the same as rejecting an opinion. *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012).

groomed." *Id.* at 26 (citing *id.* at 474–75, 477, 575, 580, 582, 586, 627, 631, 674, 684, 733, 738, 745, 751, 757, 762, 768, 773, 781, 787, 792, 799, 804, 827, 832, 840, 846, 861, 904, 909). In fact, Plaintiff reported that she interacted *socially* with her family members as one of her activities of daily living. *Id.* (citing *id.* at 223–24, 226). Further, the limitations found by Dr. Hughson differed significantly from those found by Drs. Walker and Smith. *Compare id.* at 912 (Dr. Hughson opining that Plaintiff had three moderate to marked limitations and four marked limitations), *with id.* at 91–93, 108–110 (Drs. Walker and Smith opining that Plaintiff's mental impairments at most moderately impaired her work-related functions). The ALJ, therefore, had a justifiable basis for finding that Dr. Hughson's opinions were inconsistent with the record. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Dr. Hughson also did not reconcile the significant differences in the two sets of limitations she assessed. As mentioned, Dr. Hughson opined that Plaintiff was significantly more limited in 2018 than she did in 2017. *See supra* at 7–8; *compare id.* at 479, *with id.* at 912. Plaintiff argues that Dr. Hughson's shift was reasonable given the circumstances—the two opinions were rendered over a year apart and the second opinion was based on an examination that lasted longer than the first. ECF 15 at 14; *see also* AR 474, 903.[9] In addition, Plaintiff insists that Dr. Hughson *did* explain the differences between her two opinions by writing that she "believe[d] that [Plaintiff] [wa]s exhibiting the full clinical picture of someone whose *physical* system ha[d] been biologically impacted by the effects of trauma." ECF 14–15 (quoting AR at 910) (emphasis added).

---

[9] Dr. Hughson's first examination of Plaintiff on March 6, 2017, lasted 65 minutes, AR at 474, and the second examination on July 7, 2018, lasted 120 minutes. AR at 903.

11

The mere fact that Dr. Hughson's examinations took place a year apart and lasted for different lengths of time, however, does little work in harmonizing her two opinions.[10] Absent an explanation as to why Dr. Hughson found Plaintiff to be much more impaired only a year later, the Court cannot hold that the ALJ erred in finding Dr. Hughson's opinions inconsistent with one another. *See Newbold*, 718 F.3d at 1262 (holding that the Court in reviewing the ALJ's decision can "neither reweigh the evidence nor substitute [its] judgment for that of the agency." (quoting *Branum*, 385 F.3d at 1270)). Moreover, the part of the 2018 opinion that Plaintiff says resolves these inconsistencies addressed only Plaintiff's *physical* impairments, not her *mental* impairments. *See* AR at 910. And it is after all the unexplained incongruity between Dr. Hughson's assessed *mental* limitations that the ALJ found problematic. *See id.* at 26.

Last, the ALJ did not err in concluding that Dr. Hughson's opinions were internally inconsistent. Dr. Hughson opined that Plaintiff had significant limitations in her abilities to interact with the public, coworkers, and supervisors. *Id.* at 912. But, as the ALJ noted, Dr. Hughson found Plaintiff to be pleasant and cooperative. *Id.* (citing *id.* at 474–75, 477, 903, 909). And the ALJ cited to Dr. Hughson's observations that Plaintiff had relatively unremarkable speech, maintained eye contact, and was adequately groomed. *Id.* (citing *id.* at 904). While there may have been observations supporting Dr. Hughson's conclusions (for example, Plaintiff's self-reports of irritability and struggles with anger, *see id.* at 475–76, 906), the ALJ did not err in finding that Dr. Hughson's opinions were internally inconsistent because the ALJ provided good reasons for doing

---

[10] Plaintiff also argues that the time between the two examinations was significant because Dr. Hughson had access to more medical records when she rendered her 2018 opinion. *See* AR at 14. Although this may be true, that fact alone does little to undercut the ALJ's principal reason for rejecting Dr. Hughson's opinions—i.e. that "Dr. Hughson provided no explanation for the discrepancies in her opinions." AR at 26. And while the Court may have come to a different conclusion than the ALJ if it were the original factfinder, it is out of the bounds of its review to insert its own judgment for that of the ALJ. *See Newbold*, 718 F.3d at 1262.

so. *See Oldham*, 509 F.3d at 1258 ("The ALJ provided good reasons in his decision for the weight he gave to the treating sources' opinions . . . Nothing more was required in this case.").

In sum, because the Court finds that the ALJ's gave sufficient valid reasons for her decision to give Dr. Hughson's opinions little weight, the Court holds that the ALJ did not err in weighing them.

### B.  The ALJ Adequately Accounted for Moderate Limitations Found by Dr. Walker

Plaintiff next contends that the ALJ erred by giving "great weight" to the opinion of Dr. Walker but then not accounting for two of the moderate limitations that he found: (1) accepting instructions and responding appropriately to criticism from supervisors and (2) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. ECF 15 at 17 (citing AR at 92).

It is well understood that "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007). And although it is permissible for an ALJ to account for a claimant's limitations by restricting her to unskilled work, *Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2015), such restriction may not always adequately address a claimant's mental limitations. *Id.*; *Chapo v. Astrue*, 682 F.3d 1285, 1290 n.3 (10th Cir. 2012).

The ALJ sufficiently accounted for the limitations assessed by Dr. Walker. Here, the ALJ restricted Plaintiff to unskilled work. AR at 26; *see also* AR at 60–61. Generally, "unskilled work" includes jobs that "need little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568. This type of work typically involves "dealing

13

primarily with objects, *rather than . . . people.*" SSR 85-15, 1985 WL 56857, at *4 (emphasis added). Based on the vocational expert's testimony, the ALJ determined that Plaintiff could work representative occupations like "price tagger" and "photocopy machine operator." AR at 29. Both positions do not require significant people skills (i.e. taking instructions from or helping people). Dictionary of Occupational Tittles ("DOT"), 207.685-014 PHOTOCOPYING-MACHINE OPERATOR, 1991 WL 671745; DOT, 209.587-034 MARKER, 1991 WL 671802. Moreover, the DOT descriptions of the specific duties required by each occupation indicate that neither position demands significant interaction with supervisors nor contact with coworkers. *See id.*[11] Thus, even if the restriction to unskilled work did not alone sufficiently account for the moderate limitations found by Dr. Walker, any error on the part of the ALJ in failing to specifically account for those limitations was harmless because the duties of those occupations were consistent with the limitations found by Dr. Walker. *See Bainbridge v. Colvin*, 618 F. App'x 384, 391 (10th Cir. 2015) (unpublished) (holding that an ALJ's error in failing to include limitations in plaintiff's RFC was harmless because the occupations the ALJ found the plaintiff capable of working did not require duties involving the omitted limitations); *c.f. Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir.

---

[11] The duties of a "photocopying-machine operator" include: "[t]ending duplicating machine to reproduce handwritten or typewritten matter: Plac[ing] original copy on glass plate in machine. Plac[ing] blank paper on loading try. Set[ting] control switch for number of copies. Press[ing] button to start machine which transfers image of original copy onto blank paper by photographic and static electricity process. May clean and repair machine. May receive payment for duplicate copies. Important variables may be indicated by trade name of machine tended." DOT 207.685-014 PHOTOCOPYING-MACHINE OPERATOR, 1991 WL 671745.

The duties of a "price marker" include: "[m]ark[ing] and attach[ing] price tickets to articles of merchandise to record price and identifying information: Mark[ing] selling price by hand on boxes containing merchandise, or on price tickets. T[ying], glu[ing], sew[ing], or stapl[ing] price ticket to each article. Press[ing] lever or plunger of mechanism that pins, pastes, ties, or staples ticket to article. May record number and types of articles marked and pack them in boxes. May compare printed price tickets with entries on purchase order to verify accuracy and notify supervisor of discrepancies. May print information on tickets, using ticket-printing machine. DOT 209.587-034 MARKER, 1991 WL 671802.

2004) (holding that an ALJ's error is harmless "where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.").

For these reasons, the Court holds that any error by the ALJ in omitting to mention two of the limitations found by Dr. Walker was entirely harmless.

### C. The ALJ Included the Necessary Mental Function-by-Function Assessment, as Required by SSR 96-8p

Plaintiff argues finally that the ALJ erred in formulating the RFC because she did not perform a mental function-by-function assessment in accordance with SSR 96-8p. ECF 15 at 19. More specifically, Plaintiff insists that the ALJ erred by not explaining why the RFC restricted Plaintiff's interactions with the public but not her interactions with supervisors and coworkers. *Id.* at 20.

The RFC represents the most a claimant can do despite her limitations. SSR 96-8p, 1996 WL 374184, at *2. Relevant here, the part of an RFC describing a claimant's nonexertional capacity considers "all work-related limitations and restrictions that do not depend on an individual's physical strength." *Id.* at *6. The "function-by-function" assessment component of SSR 96-8p requires the ALJ to express the limiting effect of a claimant's mental impairments in terms of work related functions "generally required by competitive, remunerative work includ[ing] the abilities to: understand, carry out, and remember instructions, use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.*

Here, the ALJ's RFC explicitly addressed Plaintiff's limitation with respect to social interaction in the work setting—"occasional and superficial interactions with the public." AR at

15

20. The Court reads SSR 96-8p to require nothing more. It appears that Plaintiff's position is that the ALJ erred by not including an explicit finding on Plaintiff's ability to interact with supervisors and coworkers. The Court disagrees that such an explicit finding was necessary. Indeed, the Tenth Circuit has held otherwise.

In *Hendron v. Colvin*, 767 F.3d 951, 956 (10th Cir. 2014), the ALJ found that the plaintiff had the RFC to perform a full range of sedentary work "as defined in 20 C.F.R. § 404.1567(a)." The plaintiff challenged the finding because the ALJ had assessed her RFC "without an explicit function-by-function analysis" and thus "overlooked her problems with sitting." *Id.* In support of her position, the plaintiff "point[ed] to evidence . . . that she could sit for only one-half hour at a time." *Id.* But because the ALJ considered the evidence supporting the plaintiff's potential sitting limitation, the Tenth Circuit held that "the ALJ's failure to find explicitly that [the plaintiff] was capable of sitting for six hours during a regular eight-hour work day was not critical to the outcome of [the] case, and [the plaintiff] ha[d] not demonstrated error." *Id.* at 957.

The same is true here. The ALJ considered Plaintiff's reports of "having a hard time being around others." AR at 23, 25. In evaluating the limiting effect of Plaintiff's alleged problems with social contact, the ALJ observed that Plaintiff did "not have problems dealing with authority figures," *Id.* at 23 (citing *id.* 225, 227), was able to socialize "sufficiently to go to a store to shop for groceries and visit with her family members," *id.* (citing *id.* at 224, 226), and "was usually described as pleasant and cooperative," *id.* (citing *id.* at 474–75, 477, 575, 580, 582, 586, 674, 684, 733, 738, 745, 751, 756, 762, 773, 781, 787, 792, 799, 804, 827, 832, 840, 846, 854, 861, 904, 909). "Thus, the ALJ did not overlook," *Hendron*, 767 F.3d at 957, Plaintiff's potential limitations in interacting with coworkers and supervisors; she found that the evidence only supported a

16

limitation to "occasional and superficial interactions with the public," *id.* at 20.[12]

## VI. CONCLUSION

For the foregoing reasons, the Court holds that the ALJ applied the correct legal standards and that her findings and decision were supported by substantial evidence.

**IT IS THEREFORE ORDERED** that the Commissioner's final decision is **AFFIRMED**, that Plaintiff's Motion is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*

---

[12] Plaintiff also appears to argue that there was evidence in the record that supported further social limitations. *See* ECF 15 at 20–23. This argument invites the Court to engage in an impermissible reweighing of the evidence, an invitation the Court must decline. *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).